Born of a concubinal relationship existing between Floyd Stringfellow and Birtha Davis that commenced in the year 1933, are the minors Vera Lee, Mary Belle, John L. and Jim William Stringfellow. To these children, the said father sought to transfer, under a notarial act of donation signed and executed by him on October 30, 1939, and duly recorded, a 40-acre tract of land located in Natchitoches Parish, Louisiana, that he owned and on which all lived. A short *Page 912 
time after that date he removed from the property, deserted his said common law wife and the children, and was married to another woman.
On February 5, 1940, Stringfellow executed a second notarial act in which there was described a sale and conveyance of said land unto Archie Mabel Niette for the consideration of $490 cash in hand paid.
The grantee under the latter instrument instituted this petitory action on March 18, 1940, impleading as defendants the above named four children and their mother. She alleges title to the property by virtue of the act of sale from Stringfellow; that the defendants "are in possession, actual and physical of said property, without any title whatsoever to it and without any right to remain on said property"; and that they refuse to deliver possession thereof. Further, she assails the donation instrument, under which defendants are holding possession, alleging that "it is null and void as being an incomplete instrument in that the donees did not appear and accept the donation."
Plaintiff prays for judgment recognizing her as the true and lawful owner of said property, entitled to full and undisturbed possession thereof, and ordering defendants to deliver possession to her.
Defendants, in a joint answer, admit their physical and corporeal possession of the land and improvements, and contend that, by so possessing it, there has been effected an acceptance of the donation. Affirmatively and further averring they charge that the purported act of sale from Stringfellow to plaintiff was not supported by any price or consideration; that it was "a mere simulation, a sham and a fraudulent transaction"; and that it was executed "in furtherance of a fraudulent, unlawful and illegal conspiracy and design concocted and entered into * * * with the view and in an effort to cheat and defraud" the minors and their mother.
A trial of the case resulted in a judgment in favor of defendants ordering a rejection of the demands of plaintiff and dismissing the suit at her costs. From it she appealed.
An agreement of counsel, appearing in the record, shows that:
"* * * the defendants were living on the property in question prior to the date of the donation, at the time the act of donation was passed and are still living there, and that the possession of the defendants since the act of donation in question has been held in fact and in right as owners and that the said possession has been continuous and uninterrupted, peaceable, public and unequivocal."
The donation instrument executed by Stringfellow bears no formal acceptance by the minors. It was not signed by anyone for and in behalf of them. Under these circumstances, in view of the Supreme Court's decision in the case of Works v. Noble,177 La. 681, 149 So. 423, the question of the validity of the title under which the children and mother are possessing admits of serious debate. We find it unnecessary to pass upon this issue, however, because the evidence in the record is convincing that the deed from Stringfellow, on which plaintiff predicates her title, is simulated and was confected solely in the interest of depriving the minors and their mother of possession of the property. In other words, it appears certain that plaintiff is only a party interposed, acting for and on behalf of the father of those illegitimate children.
In an action of revindication the plaintiff must make out his title, otherwise the possessor, whoever he be, shall be discharged from the demand. Code of Practice, Article 44. In interpreting this codal provision, our courts have held on numerous occasions that the burden of proof in a petitory action is with the plaintiff, and he must recover on the strength of his own title and not on the weakness of that under which defendant holds possession. Plaintiff's burden in the instant case, in our opinion, has not been sustained.
It might be argued herein, although it has not been, that defendants are without right to question the transaction by which plaintiff acquired the deed, valid on its face, to the property. There is a well known principle of law, however, to the effect that "the right of the party assailed in a petitory action to inquire into the validity of the proceedings under which the party attacking acquired title can admit of no doubt" (Cronan v. Cochran, 27 La.Ann. 120; Surgi v. Colmer, 22 La.Ann. 20, Thibodeaux v. Thibodeaux, 112 La. 906, 36 So. 800); and seemingly it finds fitting application to this cause. But if such principle be inapplicable here, we can not grant the demands of this plaintiff against the defendant children, persons who are not trespassers on the property but are residing there with their mother in good faith and with the belief that they are possessors under a *Page 913 
valid title translative of ownership. To do so would constitute an approval by us of the illegal conspiracy, shown by evidence admitted without objection, that was conducted by Stringfellow and plaintiff; and a court will not lend itself to the furtherance of transactions of that kind.
Among the many facts and circumstances gleaned from the transcript of testimony, which compel our above announced conclusion of fact, are those hereinafter related.
Plaintiff is a niece of her grantor, Stringfellow. After the desertion of his concubine and children, the two lived for awhile in the same house in what is known as the Spanish Lake settlement of Natchitoches Parish. Later, and at the time of the trial, they lived in separate houses located less than one hundred yards apart. They are close friends and always have been; and she visits with him every day. To use her words: "I drink coffee there every day when I am hoeing close to the house".
Plaintiff and her husband are known as half-hands or share croppers. They cultivate each year from five to eight acres of land that belongs to some one else, provide their own living necessities, and receive for their efforts one-half of the crop produced. Ownership of no realty, other than that involved herein, is asserted. Occasionally the husband finds employment under the W.P.A. program of the Federal Government.
It is the testimony of plaintiff that on February 5, 1940, with full knowledge of the recorded donation in favor of the minors and of the mentioned concubinal relationship, she and Stringfellow went to the City of Natchitoches together, a distance of about twenty-one miles, and there executed the deed in question before a notary public. She knew nothing about the productive capacity of the affected land. The cash consideration recited in the instrument was not paid in the presence of the notary or the attending witnesses, the reason given for this being that "I didn't want nobody to see where I got my money from." Thereafter, according to her assertion, she walked into a rest room of a bus station, withdrew $490 in cash from a place it was being carried, and then proceeded to an automobile parked on a street in Natchitoches and paid the money to Stringfellow who was there with his wife. Two disinterested persons observed the payment, stated plaintiff; but neither they nor Stringfellow and his wife were offered by her as witnesses in the presentation of her case. Presumably the testimony of those persons, if it had been adduced, would not have corroborated hers.
It was further testified by plaintiff that the funds had been kept between the mattresses of her bed — "I don't put my money in no bank, I am scared of them"; that it had been received entirely from the share cropping operations and day labor carried on by her and her husband; and that their farming ventures had produced approximately $103 per year.
According to a brother-in-law of plaintiff, the latter and her husband left the Herman Taylor place a few years before the deed's execution and came to the home of her father-in-law, located in the Spanish Lake settlement, for a place to stay. When asked the question: "You don't know what she made on Herman Taylor's place", such witness replied: "I don't know what she made, but when she came home she didn't have nothing to live on, and I don't imagine they made much".
It is the testimony of a thoroughly disinterested witness that plaintiff and her husband farmed as share croppers on a small scale and, under such arrangement, were required to pay their own expenses; that they cultivated seven or eight acres, which produced about one-half bale of cotton per acre; and that in the fall of 1939 cotton was worth around nine cents per pound. Assuming that four bales were made by the parties on the eight acres, their share of the production, being one-half thereof, was two bales. At five hundred pounds per bale, they produced a total of one thousand pounds, which, at nine cents per pound, provided them only $90. From this, and the small earnings from day labor, payment of their living expenses was necessary; and obviously, very little, if any, surplus remained.
To reiterate, it is convincingly shown by the record, particularly by the above detailed circumstances, that plaintiff paid nothing for the property; and her demands, in our opinion, were properly rejected.
The judgment is affirmed.
 *West Page 14